UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,               Case No. 19-cr-20799

v.                         HON. MARK A. GOLDSMITH

JAVIER LOMALI-LANDERAS,

      Defendant.

_____/

## UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America opposes defendant Javier Lomali-Landeras's motion for compassionate release (ECF No. 15), because he did not exhaust his administrative remedies, and because he has not made the requisite showings under 18 U.S.C. § 3582(c)(1)(A).

The grounds for this response are set forth in the attached brief.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/Brandon C. Helms*
Brandon C. Helms
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9639
Email: Brandon.Helms@usdoj.gov

Dated: June 18, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                     Case No. 19-cr-20799

v.                                  HON. MARK A. GOLDSMITH

JAVIER LOMALI-LANDERAS,

              Defendant.
_____/

## BRIEF IN SUPPORT OF UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

### Issue Presented

Whether the Court should deny Lomali-Landeras's motion for compassionate release (ECF No. 15), because he is not eligible under 18 U.S.C. § 3582(c)(1)(A).

**Table of Contents**

Background ......................................................................................................3

  I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement. .................................................4

   A.  The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities. ..........................................................4

   B.  The Bureau of Prisons is increasing the number of inmates who are granted home confinement. ............................................................6

  II.   The Court should deny Lomali-Landeras's motion for compassionate release. .......................................................................................9

   A.  Binding authority prohibits the Court from granting release, because Lomali-Landeras has not satisfied the statutory exhaustion requirement. .11

   B.  Lomali-Landeras is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13. .......................................12

   C.  The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release. ..................................................................17

  III.  If the Court were to grant Lomali-Landeras's motion, it should order a 14-day quarantine before release. ...........................................18

Conclusion ......................................................................................................18

After twice being removed from the United States to Mexico as an alien who was in the United States illegally, Defendant Javier Lomali-Landeras was found in Detroit without legal authorization on November 15, 2019. (ECF No. 1, Compl., PgID 1–4). Lomali-Landeras had a prior criminal record, having stolen a car in 1995 and having been convicted of illegal reentry into the United States in 2011. (*Id.* at PgID 5). After he pled guilty to an Information (ECF No. 8), the Court sentenced him to a term of imprisonment of 8 months. (ECF No. 14, Judg., PgID 2).

Lomali-Landeras began serving his sentence on November 26, 2019, when the U.S. Marshals Service took him into custody, and he is expected to be released on July 27, 2020. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Lomali-Landeras does not qualify for compassionate release. For starters, because Lomali-Landeras has not satisfied the mandatory exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A)—(see Ex. A, BOP Email confirming no compassionate release request)—the Court is barred from addressing his argument on the merits. *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694 (6th Cir. June 2, 2020). Lomali-Landeras also does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir.

2020). Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Lomali-Landeras does not have a condition that places him at higher risk from Covid-19. In addition, his offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he could steal another car or do whatever else is necessary to remain in the United States. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release, because he could seek to avoid deportation by running or hiding from law enforcement.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Lomali-Landeras, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of June 18, 2020, this process has already resulted in at least 4316 inmates being placed on home confinement. *See* BOP Covid-19 Website. Over 100 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and

"the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 2020 WL 3056217, at *11—the Court should deny Lomali-Landeras's motion for compassionate release.

## Background

Lomali-Landeras pled guilty to illegally reentering the United States after being removed from the United States twice, and after being convicted of stealing a car and illegally reentering the United States on a prior occasion. (ECF No. 1, Compl., PgID 1–5). The Court sentenced him to a term of imprisonment of 8 months. (ECF No. 14, Judg., PgID 2).

Lomali-Landeras began serving his sentence on November 26, 2019, when the Marshals took him into custody, and he is currently incarcerated at FCI Milan. He is fifty-one years old, and his projected release date is July 27, 2020. While he references no medical conditions in his letter to the Court, his only underlying medical conditions are two minor conditions that are being treated with medication. (*See* Ex. B, Med. Records filed under seal, pp. 3–4, 7–8, 34, 36, 46, 63). Nevertheless, Lomali-Landeras has moved for compassionate release, vaguely citing the Covid-19 pandemic as his reason. (ECF No. 15, Def.'s Ltr., PgID 31) ("these unexpected conditions"). However, he has not requested compassionate release at the administrative level, for any reason. (Ex. A, BOP Email).

3

**Argument**

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

**A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at \*2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at \*2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at \*2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

4

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* In fact, Lomali-Landeras has already benefitted from the quarantine procedures when he had a cough back in April 2020, (Ex. B, Med. Records, pp. 10–13); it does not appear that he ever contracted Covid-19, and he is now back in the general population.

Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from

Covid-19 and ensure that they receive any required medical care during these
difficult times.

**B.**   **The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the
placement of federal prisoners in home confinement. Recent legislation now
temporarily permits the Bureau of Prisons to "lengthen the maximum amount of
time for which [it] is authorized to place a prisoner in home confinement" during the
Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES
Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The
Attorney General has also issued two directives, ordering the Bureau of Prisons to
use the "various statutory authorities to grant home confinement for inmates seeking
transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive
to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the
Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to
consider the totality of circumstances for each individual inmate" in deciding
whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4316
federal inmates have been granted home confinement since the Covid-19 pandemic
began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth
Circuit recently stressed, these efforts show that "[t]he system is working as it

6

should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](); [04-03-2020 Directive to BOP]()). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19

back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—have already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to

8

health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Lomali-Landeras's motion for compassionate release.

Lomali-Landeras's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been

9

imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at *1–*4.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   Binding authority prohibits the Court from granting release, because Lomali-Landeras has not satisfied the statutory exhaustion requirement.

The Court must dismiss Lomali-Landeras's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the

defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *2 (6th Cir. June 2, 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at *1–*4; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

Lomali-Landeras did not exhaust his administrative remedies. He never requested compassionate release from BOP. (*See* Ex. A, BOP Email). And although he dated his letter to the Court as March 31, 2020, the Clerk did not enter the letter on the docket until June 15, 2020, (ECF No. 15), and BOP was only informed of the request for compassion release the next day, June 16, 2020. It has not had thirty days to consider Lomali-Landeras's request. Therefore, Lomali-Landeras's motion should be dismissed for failure to exhaust. *Alam*, 2020 WL 2845694, at *4–5.

## B.    Lomali-Landeras is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even if Lomali-Landeras had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing

12

Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Lomali-Landeras and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

14

Lomali-Landeras's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Under the Sentencing Guidelines, Lomali-Landeras does not qualify for compassionate release, because he is under sixty-five years old (he is 51), and because he does not have any serious physical or mental conditions. *See* USSG § 1B1.13 cmt. n.1. Lomali-Landeras's age (51) and medical records also confirm that he does not have a CDC-recognized risk factor for Covid-19. *See* CDC Risk Factors; (*see also* Ex. B, Med. Records, pp. 3–4, 7–8, 34, 36, 46, 63) (indicating Lomali-Landeras is receiving medication to treat two minor conditions that are not CDC risk factors). So whether considered alone or in combination with the Covid-19 pandemic, Lomali-Landeras's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

Lomali-Landeras also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3

(E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7; *United States v. Israel*, No. 17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017) (recognizing that "economic harm may qualify as a danger" foreclosing release).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Lomali-Landeras's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). For example, he

16

has been convicted of stealing a car and possessing burglary tools. (PSR, ¶¶ 29, 30). And while the case was dismissed for unknown reasons, he was arrested for "touch for sexual arousal" in December 2018. (*Id.* at ¶ 43). This criminal history indicates a danger to the community.

As a result, Lomali-Landeras is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a)

factors). So even if the Court were to find Lomali-Landeras eligible for compassionate release, the § 3553(a) factors should still disqualify him.

In this case, Lomali-Landeras's history and characteristics demonstrate why he should not receive a reduced sentence. He has reentered this country multiple times without lawful authority, and he has committed crimes while he was in the country, including stealing a car. *See* § 3553(a)(1). This criminal history and pattern of illegal immigration shows a disrespect for the law, a need to deter Lomali-Landeras, and a need to protect the public. *See* § 3553(a)(2)(A)–(C).

For these reasons, the Court should find that the § 3553(a) factors weight against compassionate release.

## III.   If the Court were to grant Lomali-Landeras's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Lomali-Landeras's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Lomali-Landeras's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/Brandon C. Helms*
Brandon C. Helms
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9639
Email: Brandon.Helms@usdoj.gov

Dated: June 18, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2020, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system.

I further certify that I caused a copy of the foregoing paper via U.S. mail to be

sent to the following non-ECF participant:

> Javier Lomali-Landeras
> Reg. No. 45021-039
> FCI Milan
> Federal Correctional Institution
> P.O. Box 1000
> Milan, MI 48160

                                    */s/Brandon C. Helms*
                                    Brandon C. Helms
                                    Assistant United States Attorney